**UNITED STATES of America, Petitioner,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, Respondent.**

**Misc. No. 11710.**

United States District Court, W.D. Pennsylvania.

Aug. 15, 1985.

Craig R. McKay, Asst. U.S. Atty., Civil Div., Pittsburgh, Pa., Robert L. Ashbaugh, Dept. of Justice, Civil Div., Washington, D.C., for petitioner.

Herbert L. Fenster, Washington, D.C., Philip Baskin, Pittsburgh, Pa., for respondent.

Joseph A. Katarincic, Pittsburgh, Pa., for amicus curiae Chamber of Commerce of U.S.

Stephen A. Bokat, Washington, D.C., for amicus curiae Institute of Internal Auditors.

OPINION

ROSENBERG, District Judge.

This matter is before me after the filing by the Inspector General (IG) of the Department of Defense (DOD) for the United States of America on December 27, 1984, of a Petition For Enforcement of Administrative Subpoena by the Government, pursuant to the Inspector General Act of 1978, as amended 5 U.S.C. Appendix § 6(a)(4) and 28 U.S.C. § 1345, against Westinghouse Electric Corporation (Westinghouse) (respondent). The subpoena was served upon the respondent Westinghouse on September 28, 1984, and after Westinghouse refused compliance, this action followed.

Joseph H. Sherick, the Inspector General, on September 27, 1984 issued the subpoena duces tecum to an official of the respondent, commanding his appearance before Mr. Newton H. Davis, Branch Manager, Defense Contract Audit Agency (DCAA), Pittsburgh, Pennsylvania, or his designees, at 1000 Liberty Avenue, Room 2112, on October 11, 1984, at 9:00 o'clock a.m., and to bring "the following information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence pertaining to internal audits for the period January 1, 1982 through October 1, 1984, for which costs have been incurred by Westinghouse Electric Corporation and any of its segments and allocated to contracts awarded by the Department of Defense or to any subcontractors under the Department of Defense prime contracts to include the items listed in Appendix A which are necessary in the performance of the responsibility of the Inspector General under the Inspector General Act to produce and supervise audits and investigations relating to, and to promote economy, efficiency, and effectiveness in the administration of, and to prevent and detect fraud and abuse in, the programs and operations of the Department of Defense".

The respondent in its answer contended that the administrative subpoena issued by the IG should not be enforced because (1) the subpoena fails to identify the investigation or inquiry to which it relates; (2) the subpoena was issued for the unlawful and improper purpose of obtaining information for another agency, the DCAA, which does not have subpoena power[1] to coerce a settlement of a collateral contract dispute (as to whether the DCAA has a right to examine the respondent's internal audit reports, an issue which is presently before the Arm-

1. This outgrowth springs from the root of the Congressional Report that it would be improper for the IG to serve another agency.

ed Services Board of Contract Appeals for decision); (3) the documents sought are not related to DOD programs nor necessary to the performance of the IG's statutory functions; and (4) the production would be unduly burdensome.

AMICUS CURIAE

After the respondent filed an answer, the Chamber of Commerce of the United States (Amicus) averring it was the largest federation of business and professional organizations in the United States and that it represented the interests of its members in matters before the court, filed a motion for leave to present a brief amicus curiae on March 4, 1985. In its brief it attempted to support the position of the respondent by arguing that internal audit departments of corporations must be independent and confidential in order to be effective. On May 10, 1985, the Institute of Internal Auditors (Amicus) averred it is an international organization comprised of internal auditors in both government and private sectors, and filed a Motion to Submit Brief Amicus Curiae. It also practically reiterated the position of the Chamber of Commerce, adding that allowing the government "unrestricted access" to internal audit reports would ultimately discourage detection of fraud, waste and abuse by the internal auditors. These motions were granted.

DISCOVERY

Initially, the respondent requested discovery in the proceeding of the depositions of Joseph H. Sherick, the Inspector General of the Department of Defense, James H. Curry, Assistant Inspector General for Audit Policy and Oversight of the Department of Defense, Derrick Vander Schaaf, Deputy Inspector General of the DOD; Charles O. Starrett, Director, Defense Contract Audit Agency, and Newton H. Davis, Pittsburgh Branch Manager of the DCAA.

After conferences among counsel, the documents sought by the respondent were: a DCAA memorandum request for a subpoena directed to the IG, dated August 14, 1984; a DCAA memorandum request for a subpoena directed to the IG, dated August 16, 1984; guidelines for the issuance of IG subpoenas dated October 7, 1983; Working Draft, Report on Oversight Review of DCAA Access to Contractor Records, dated January 11, 1983; and the Access to Records Summary of Twenty-three Field Offices with a handwritten tabulation of this summary, all of which were submitted to me for *in camera* examination.

Pursuant to agreement of counsel, a court-supervised deposition of Sherick and Curry was conducted on February 26, 1985. Subsequently, after frequent consultations and after judicial concilliation between counsel, both parties agreed that the government's production of all the previously listed documents requested by Westinghouse, except for the field office summary, along with the additional court-supervised depositions of Starrett and Davis, would satisfy the respondent's Motion For Leave to Take Discovery. After a date was scheduled for those two depositions, both parties filed a stipulation on May 2, 1985, which obviated the need for an in-court examination. Thereafter discovery was closed. A final argument was had on May 15th, at which time the stipulation and exhibits were admitted into evidence.

THE CASE

Joseph H. Sherick, the incumbent Inspector General for the Department of Defense had been in government service for over 40 years. He was previously selected and appointed by the Secretary of Defense to be the Assistant to the Secretary for Review and Oversight. After the enactment of the 1982 Amendment to the Inspector General Act of 1978, President Reagan, obviously impressed with his career and service as anticipated, appointed him as the Inspector General for the DOD by authority of the 1982 Amendment. He was accepted by the Senate with approval and took office in April, 1983.

When Sherick first came into office he assumed total control and attempted eventually to perform in accordance with the

promises made to the Committee in the Part 2 Hearing, infra.

The IG stated that he has oversight responsibility for all Department of Defense programs and activities, and to carry out this vast responsibility he is authorized to utilize and coordinate all of the audit, investigative and inspection organizations and resources of the DOD. Although he has an organization of approximately 1,000 people "to promote economy and efficiency as well as to prevent and detect fraud and abuse in a Department of 3 million", the IG must rely upon the resources of the 15,000 auditors and investigators of various accounting agencies in the DOD. It is the interrelation between these agencies which has become the focal point for the refusal by Westinghouse to comply with the subpoena.

The IG has all encompassing oversight responsibility for DOD programs and activities. To carry out this assignment, part of his duties include an evaluation of the "quality and breadth" of each organization that is guided and supervised by the IG. Pursuant to these oversight activities, when the IG uncovers "weaknesses and vulnerabilities" in the practices of the office of the IG or any other DOD auditing agency, the IG is then required to take measures to "reduce these vulnerabilities". (Sherick Affidavit, Document 1, page 1).

In June and July, 1983, the IG initiated a review of certain activities of the DCAA, the largest auditing agency in the DOD. He was thereafter periodically advised as to its progress by review of James H. Curry, the Assistant Inspector General for Audit Policy and Oversight. One area which was covered was the question of the availability to DCAA of certain records by DOD contractors. The records under question included: Board of Director meeting minutes; certain communications between a company and its outside public accounting firm; certain "audit trail" documents, and the reports of the internal audit staff of the contractors.

In each year between at least 1976 and 1983, Westinghouse presented information to the DCAA relating to the costs incurred by its internal audit activity involving defense contracts. A certain proportion of these costs were charged to the government and it approved the payment of these costs. For example, in 1983 the government was billed for and paid the sum of $554,000 as its allocated portion of internal audit costs. Following review and discussion of the allowability and allocability of such costs, the DCAA, each year, recommended approval of those costs for payment by the government until August, 1984. Prior to August, 1984 the audit costs of the respondent were approved on the basis of records other than internal audit reports and without DCAA's access to those reports (Stipulation, Document 31 and the Muhlberg Affidavit).

The evidence in the instant case, consisting of affidavits, exhibits and testimony is primarily concerned with: the IG's review and recommendations of June and July, 1983 regarding DOD auditors' access to contractor records; the request by DCAA through two August 1984 memoranda for the issuance of a subpoena; and the motivation for the issuance by the IG of the September, 1984 subpoena directed to the respondent for the production of internal audit report documents from January 1, 1982 through October 1, 1984 of DOD contracts of the corporation.

Curry testified that the purpose of the IG's July, 1983 review of DCAA audit procedures was in response to allegations about certain areas of weakness therein, such as the access by DCAA to records, the handling of suspected fraud, the reporting procedures on savings and the relationship between the investigators and auditors. The final report concerning this review was issued on March 4, 1984 (Exhibit C-1, admitted February 26, 1985).

Curry stated that the primary function of any audit is to determine "the adequacy of the internal controls of the activity that's being subject to audit". (Document 18, page 26). The purpose for the request of the internal audit reports of a contractor would be to evaluate the efficiency of their

internal systems and controls. Therefore, as a preliminary consideration prior to a DCAA audit "the first thing they have to know is the adequacy of the internal controls" (Document 18,[2] page 20).

In connection with the preparation of the DCAA report concerning their access to contractors' records, the DCAA personnel visited 28 field offices and determined to what types of documents the government auditors had access. Of 23 major defense contractor locations, where there was internal audit department functions, 6 of the contractors' locations were not providing DCAA with "complete access", which included the reports from their internal audit departments (Document 18, pages 23 and 29).

Subsequent to the compilation of this report, 4 of the contractors agreed to provide access to their internal audit reports, so as of the time of his deposition Curry stated that 21 out of 23 of the defense contractor locations investigated were providing DCAA with access to their internal audit reports.

Of the corporations providing DCAA access to internal audit reports, some of them may not have provided all of their internal audit reports to the DCAA. However, Curry testified that he knew of no instance where an internal audit report requested by the DCAA was denied by any of the 21 contractor locations providing access. In addition, a survey on July 20, 1984 of over 200 contractor locations indicated that the DCAA was obtaining access to internal audit reports at all except 16 of them (Document 18, page 44).

The IG issued a Memorandum on September 19, 1983 providing that the DOD audit and investigative agencies which are under his control may request the issuance of an IG subpoena in support of audits and investigations conducted by them, where that audit or investigation is in furtherance of a statutory function of the IG and within the scope of the IG's statutory power. This memorandum was issued by the IG to all relevant auditing segments of the DOD, the "effective organization" of the IG, including the Army Auditing Agency, Navy Audit Agency, Air Force Audit Agency, DCAA, and the Criminal Investigative Divisions of the Army, Navy and Air Force. The memorandum was admitted as respondent's Exhibit S–2 and it outlined the policy of the office of the IG with regard to audits, investigations and the issuance of subpoenae. In explaining the policy the IG testified:

> "I'm not in the business of issuing subpoenas. What I am in the business is of investigating and auditing and inspecting. And if I feel that an inspection that they have under way is of vital interest to the Department of Defense, and comes within my function, and is one in which I should give it priority, I will pick up that investigation and incorporate it as part of my function and responsibility. I will designate it as such and carry it out, using one of those service organizations, if they're already involved in that subject ..." (Sherick testimony, Tr. page 131)

In February, 1984, DCAA advised Westinghouse that it wished to conduct what it called an "inter-operational audit" of the Westinghouse internal audit functions. On June 11, the branch manager of DCAA, Pittsburgh office, set forth the DCAA rationale for requesting both the operational audit and the internal audit reports. DCAA indicated that its purpose was to obtain support for its contract auditing function. Westinghouse declined to comply with the DCAA request because these it said were internal audit reports or management documents which do not reflect incurrence and allocation costs.

On August 14, DCAA requested the IG to issue a subpoena to respondent for immediate access to all internal audit reports relating to any of their organizational elements which allocate costs to DOD contracts. On August 16, DCAA sent a second detailed letter to the IG requesting the issuance of a subpoena, for all documents

2. In-court depositions of Sherick and Curry.

generated by the Westinghouse international audit department and stated that the internal audit reports were needed "in order to reach an internal opinion on the reasonableness and allocability of internal audit costs incurred and allocated to government contracts by WEC".

The two August memoranda of DCAA (Stipulation Exhibits 1 and 2) stated that the internal audit reports "are needed for audit reviews which include in their objectives and the promotion of economy and efficiency and the prevention of fraud and abuse ..." In addition, both memoranda set forth the background of the Westinghouse audit, and the circumstances surrounding the refusal by Westinghouse to produce the documents.

After receiving the DCAA memoranda and their request for the issuance of a subpoena, the IG and his staff carefully examined this situation because, as the IG said, "I was really concerned, very much concerned, because the first thing I had to do was determine that if—if this was an indication to me that there was a potential for fraud, waste or mismanagement of Government resources and Government assets at the Westinghouse Plant" (Document 18, page 124).

After the IG received the first memorandum from the DCAA which indicated that there was a problem with access to certain records of the respondent, the IG stated that he was "concerned about that". He further asserted that this memorandum (of August 14, 1984) provoked him to ask "... why one of our major contractors would be uncooperative ... what the background of the whole problem was ... and how long this situation had gone on ..." (Document 18, pages 118 to 114).

After receiving the second memorandum from the DCAA, the IG testified that "... I was appalled that one of our major contractors would fail to cooperate with us. My sentiment was how could this contractor be so insensitive? Here, we are in the Department of Justice being criticized up and down, day and night, for not being concerned about utilization of taxpayers' resources and he's a part of the defense industry. And yet, when we ask him for reports that are routine parts of his internal control system, he refused to cooperate with us, denies us these reports. And then when I looked at the history, it showed that he had been denying them for a long time" (Document 18, page 115).

The two August memoranda contained the first request for a subpoena that the IG had ever received. The IG stated that the subpoena was not "automatically" issued, but instead the request for these documents was taken over by the IG and became his own audit (Document 18, pages 149–153).

After receiving the two memoranda from DCAA in August, 1984, the oversight responsibility for the case of respondent's refusal to produce the internal audits became that of the IG. Sherick testified that at that point "... I made it my responsibility ..." and that "... It was mine and no one else's ..." even though he used the auditors and staff of the DCAA who were then acting under his direction (Document 18, page 142). The IG emphatically stated "I did not ever think that my subpoena was a tool of DCAA. It is not a tool of anybody's but me". (Document 18, page 137).

Westinghouse is the thirteenth largest contractor with whom the DOD deals. Each year it has approximately nine billion dollars of open contracts with the DOD and two million dollars of direct contracts. At any one time, the respondent has approximately two hundred million dollars of government-owned material and property in its plants and facilities. Therefore, according to the IG, it is important for the government to know about any embezzlement[3] or fraud since it can be assumed

3. The IG has repeatedly stated that one reason for examining the respondent's internal audit reports would be to discover what, if any, action is taken by respondent upon the discovery of fraud, waste, or abuse involving DOD conracts. In a matter first raised by counsel for the respondent, Sherick testified as to his knowledge (derived solely from newspaper accounts) of an

there would be some "impact" on the government from any of these activities (Document 18, pages 97–98).

Sherick testified that he believed it was necessary to examine the internal audit reports of contractors in order to evaluate the control systems of a company which would insure that costs were being properly allocated to government contracts. Sherick agreed with Curry that a sampling procedure involved in internal audits could be duplicated by the government, but that it was more cost effective to have the actual reports of the contractor, and that such reports would be useful in evaluating the actions taken by a contractor after uncovering fraud or embezzlement (Document 18, pages 96 and 98).

The IG stated that there were a number of considerations and questions he had when he evaluated the August requests of the DCAA. The IG wanted to know: whether the accounting records and data systems of the respondent were inaccurate or unreliable; whether the work of the internal audit staff was "effective in policing itself against possible fraud, waste and mismanagement"; whether the respondent was equally diligent in searching for waste or abuse in government contracts as compared to commercial contracts; whether the act of refusal of respondent in producing the documents was itself an indication of possible frustration by Westinghouse of the efforts of its own internal audit staff with regard to possible unremedied practices of the corporation, possible nonadjustment of identified accounting errors, or perhaps failure to investigate suspicions of misconduct (Sherick Affidavit, pages 4, 5). Finally, Sherick stated that he wanted to see the actual internal audit reports which were being paid for by the government, and "to see if the government could save money by reducing its audit efforts by relying on the work already performed by the internal auditors" (Sherick Affidavit, page 5).

The IG testified that the DCAA independently continued to administratively process the demand for the internal audit reports of the respondent by withholding payments to Westinghouse and by filing certain forms. However, the IG did not "adopt" or attempt to enforce the demand of the DCAA but instead the IG made his "own demand", motivated in part by Sherick's desire to learn what was behind the respondent's refusal, and because he "... had a suspicion that there's something there that they don't want us to have". (Document 18, pages 144, 145).

The IG had no intention to "sublet" any of his powers to the DCAA, but he chose DCAA to initially receive the information requested by the subpoena because they were familiar with the situation; they had their auditors already at the location of the respondent's headquarters in Pittsburgh; they knew what records were involved and they had long experience in reporting back to the IG for direction. The IG considered using some of the limited number of auditors in his own staff; but at that time his auditors were "tied up in my spare parts reviews". In addition, using the DCAA auditors would save the government travel expenses and the expenses involved in new auditors learning the contractor's system. (Document 18, page 198).

The IG stated that his office "will actively involve ourself in the analysis of the material ..." produced by the subpoena (Document 17, page 208). As the audit of the subpoenaed documents proceeds, the IG will personally be informed of the findings through Mr. Eberhardt, of the IG's office. The IG assured the court that his office routinely handles the most secret and sensitive matters, and that he considers protecting the confidentiality of the Westinghouse records to be a "solemn trust" (Document 18, page 177, 210).

incident of alleged embezzlement and fraudulent invoicing which included a Westinghouse employee at its Baltimore facility, which principally performs defense contract work. An affidavit submitted by the government indicated that approximately $65,000 may have been misdirected to the possible detriment of the DOD. (See Document 18, pages 98–103 and Document 15).

The IG repeatedly demonstrated his belief and practice that all of the various audit and investigatory divisions within the DOD were under his immediate control. For example, the IG used the DCAA in his massive spare parts investigation which uncovered lavishly expensive Allen wrenches and hammers (Document 18, page 172). Furthermore, it was not unusual for the IG to not only employ the DCAA in his investigations, but to receive information from the DCAA that would lead to an investigation or other action by the IG (Document 18, page 184). Therefore, it is apparent that the audit and investigatory functions within the DOD are not regimented in a static order, but that all these resources are in a state of flux and can be assembled and reassembled according to the will of the IG.

The DOD contract business with the respondent is in the billions of dollars each year for all kinds of contracts. Some are cost reimbursement type, incentive, time and materials, labor hour, price redeterminable, or any combination thereof. There is no indication upon what basis the more than two billion dollars of work in progress and facilities and material in their plant is being used for defense contracts. It would be a matter of logic to ascertain how the government funds have been accounted for by the respondent as to contract prices, repairs, losses or guarantees.

MENS LEGISLATORIS

Although the respondent has raised no constitutional questions here, and since it does question the legal and functional capacity and power of the IG to issue this specific subpoena duces tecum for the particular documents which he requested, and has also asserted a lack of intention on the part of Congress to grant power to the IG to subpoena the particular internal audit documents of the respondent, it becomes necessary that we examine both the original Inspector General Act of 1978, 5 U.S.C. Appendix 3, and the Amendment of 1982, 5 U.S.C. Appendix 3, § 8, as well as the Congressional Report of 1978 and the history and hearings in the Senate in connection with the amending Act of 1982, before the Committee on Governmental Affairs, United States Senate, Ninety-seventh Congress, First Session, Part 1, June 18, 1981 and Part 2, March 25, 1982. These include Senatorial hearings conducted by the Senate as they relate to the contemplated Act of 1982.

The Inspector General Act of 1978 (1978 Act) established the office of Inspector General in seven executive departments and six executive agencies and consolidated existing auditing and investigative resources to more effectively combat fraud, waste and mismanagement in the programs and operations of those departments, and agencies (1978 U.S.Code, Cong. & Ad. News, page 2676).

Congress provided in the 1978 Act that each IG would be an independent official and appointed by the President of the United States and confirmed by the Senate. It provided for their purposes and duties and gave each the mandate "to consolidate existing auditing and investigative resources to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations of those departments and agencies". It stated rules and regulations by which he was to be governed and by which he would be accountable, particularly, to the Congress.

We must remember here that the Inspector General Act of 1978 did not create an IG for the DOD, as we shall presently see and understand; however the 1978 Act became the foundation for the changed enactment of 1982 which did create the IG of the DOD.

The 1978 Act stated:

"It shall be the duty and responsibility of each Inspector General ...

To recommend policies for, and to conduct, supervise, or coordinate relationships between such establishment and other Federal agencies; State and local governmental agencies, and nongovernmental entities with respect to (A) all matters relating to the promotion of economy and efficiency in the administra-

tion of, or, the prevention and detection of fraud and abuse in, programs and operations administered or financed by such establishment, or (B) the identification and prosecution of participants in such fraud or abuse." 5 U.S.C.Appe. § 4(a)(4).

To effectuate this broad mandate over "all matters" relating to economy and efficiency of an agency, Congress empowered each IG:

> "... (4) to require by subpena (sic) the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act ..."

Therefore, in examining only the language of the 1978 Act (which was later made applicable to the IG of the DOD), for the subpoena in the instant case to be enforceable, the internal audit reports sought must be "necessary" for the IG's oversight responsibilities with regard to "all matters" relating to economy and efficiency of the DOD.

Both the 1978 Inspector General Act and the Amendment of 1982 are not only unambiguous, but they speak clearly and distinctly for the purpose of preventing and detecting "... fraud and abuse in, programs and operations administered or financed by ..." the specific departments. However, because the respondent in raising the contentions as it does seems to have confused a comment in the Congressional Report for the 1978 Act and has disregarded the specifics in both Acts, but particularly in the Amendment of 1982, and when Congress has spoken as vehemently as it did here, it is appropriate, while not necessary, that these be pointed out to add further forcefulness to the statutory text.

In analyzing an issue of statutory construction we " 'must begin with the language of the statute itself' ". *Bowsher v. Merck,* 460 U.S. 824, 830, 103 S.Ct. 1587, 1591, 75 L.Ed.2d 580 (1983) (quoting cases).

The case of *Train v. Colorado Pub. Int. Research Group,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976) re-enforced what was stated in *United States v. American Trucking Assns.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) "To the extent that the Court of Appeals excluded reference to FWPCA's legislative history in discerning the meaning of the statute, the court was in error, for '[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' "

It was stated in *Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), at page 536, 100 S.Ct. at page 780,

> "Our analysis does not stop with the language of the statute; we must look to 'the objects and policy of the law.' *Brown v. Duchesne,* 19 How. [183] at 194 [15 L.Ed. 595]. In order to 'give [the Act] such a construction as will carry into execution the will of the Legislature ... according to its true intent and meaning,' ibid, we turn to the legislative history. *Schlanger v. Seamans,* 401 U.S. 487, 490, n. 4 [91 S.Ct. 995, 997, n. 4, 28 L.Ed.2d 251] (1971). See also *United States v. Culbert,* 435 U.S. 371, 374, n. 4 [98 S.Ct. 1112, 1114, n. 4, 55 L.Ed.2d 349] (1978); *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 9–10 [96 S.Ct. 1938, 1942–43, 48 L.Ed.2d 434] (1976).

The respondent insists that the clause in the Congressional Report of the Inspector General Act of 1978, at page 2709, that "The use of the subpoena power to obtain information for another agency component which does not have such power would clearly be improper", be translated in its strict literal sense. This would be unreasonable, particularly in light of what remedies Congress was attempting to effect by means of the creation of IGs in all departments, except in the DOD, and in light of the fact that it took another amending statute, after three years of concerned study, to create the IG for the DOD with special, additional statutory provisions.

Mr. Chief Justice Burger cited *Brown v. Duchesne,* 19 How. 194, at 197:

> " 'We think these laws ought to be construed in the spirit in which they were made—that is, as founded in justice—and should not be strained by technical constructions to reach cases which Congress evidently could not have contemplated, without departing from the principle upon which they were legislating, and going far beyond the object they intended to accomplish. *Stafford v. Briggs, supra* [444 U.S. 527], at page 545 [100 S.Ct. 774 at page 785, 63 L.Ed.2d 1 (1980) ]'."

In order to determine if Congress intended to limit this expansive language, I have thoroughly examined the legislative history and surrounding statutory circumstances of both the 1978 Inspector General Act and the 1982 Amendment. See *North Haven Board of Education v. Bell,* 456 U.S. 512, 522, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982).

Congress outlined the tremendous scope of the problem indicating that fraud, abuse and waste in the operations of Federal departments and agencies and in federally funded programs were reaching "epidemic proportions". The problem was not new, but the evidence indicated that waste and mismanagement was now of an "extraordinary magnitude". The "cardinal principle" that had been violated in the previous auditing structure was that the auditors and investigators were under the supervision of the officials of the programs which they were attempting to audit and investigate. (1978 U.S.Code, Cong. & Ad.News, 2679–2681), Congressional Report).

Congress finally made a big step forward. It enacted the Inspector General Act of 1978. By this statute it created numerous inspector generals, one for each department or agency.[4] They had the power of subpoena to inspect all documents necessary for the ascertainment of fraud, abuse, waste and mismanagement in government contracts.

While the 1978 Act did not give the IG powers to administer or to prosecute where the facts of the case might be such as would require these matters to be done, it did give him the power to report to the proper department and agency for such action and in order to permit the IG to investigate and ascertain the factual matters required for his duties, it gave him the power "to subpena (sic) such materials as he deems necessary to carry out his duties and responsibilities ..." (§ 6(a)(4), page 2708).

Oddly enough, while the legislators were considering the adoption of this statute and its particular wording, it spoke very insistently of the need of the IG of the DOD, but in the adoption of the Statute, the DOD was disregarded.

At its inception, the Congressional Report[5] at page 2676 states:

> "The purpose of this legislation is to create Offices of Inspector Auditor[6] General in seven executive departments and six executive agencies to consolidate existing auditing and investigative resources to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations of those departments and agencies." (footnote added)

At page 2677, the Report summarizes the legislation and indicates that H.R. 8588, as amended by the Committee, requires the appointment of an Inspector General in each of the 13 affected executive departments and agencies; that each requires appointment by the President with the advice and consent of Congress without regard to political affiliation, solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis,

4. Departments of Agriculture, Commerce, Education, HUD, Interior, Labor, Transportation; Agencies of Community Services, Environmental Protection, General Services, National Aeronautics and Space, Small Business Administration and Veterans' Administration.

5. 1978 U.S.Code, Cong. & Ad.News.

6. Auditor while originally contained was but an additional title for the IG.

law, managements analysis, public administration or investigation. It also details the duties and responsibilities of the Inspector General.

Congress stated at page 2682,

> "... it is a fact of life that agency managers and supervisors in the executive branch do not always identify or come forward with evidence of failings in the programs they administer."

And it follows through at page 2682, with the Inspector, the head of the agency or department, would not be under the supervision of any other official in the agency, and even the agency head would have no authority to "prevent the Inspector ... from initiating the completing audits and investigations he believes necessary".

On page 2702, under Section 4. "Duties and Responsibilities", the Report specifies the functions of the Inspector General, Subsection (a)(1), to provide supervision and coordinate policy direction and conduct, supervise audits and investigations relating to programs and operations of his establishment; under Subsection (a)(2) to make recommendations to his agency head and the Congress; Subsection (2)(3) to recommend policies for and to supervise or coordinate activities carried out by such agency or financed by such agency for the purpose of promoting economy and efficiency and detecting fraud and abuse in its programs and operations.

The Congressional Report, however, bespoke itself when it stated at page 2678:

> "The committee has decided that the legislation should also cover the Department of Defense. The legislation contains several provisions necessary to meet the *unique needs* of the Defense Department". (Emphasis added).

And yet, when Congress enacted the final version, the IG for the DOD was omitted. The explanation is eventually supplied by the Senators at the two hearings held on June 18, 1981 and March 25, 1982.

In the meantime, the Secretary of Defense supplied his own employees as various inspector generals in the defense agencies. But the Secretary also appointed one whom he titled the Assistant to the Secretary of Defense for Review and Oversight (Tr. page 86), and whom he used as were the other statutorily appointed inspector generals in accordance with the provisions of the Inspector General Act of 1978. This did not meet with the approval of the Senators and they expressed themselves openly in the hearings held for the purpose of providing an Inspector General for the Department of Defense and two other departments, the Department of Justice and the Department of Treasury.

At the hearing before the Committee on Governmental Affairs in the United States Senate, Part 2, on March 25, 1982[7] for Inspector General Legislation, Chairman Senator William V. Roth, Jr., amongst others made clarifying remarks regarding the purpose and intention of the legislation which was to be considered by the Congress.

Excerpts follow:

Page 3:

> "I am particularly concerned about the lack of centralized audit and investigative responsibilities in the Defense Department. Audit resources are so dispersed in D.O.D. that it is almost like straining tea through an ocean fishing net: too many pieces of tea leaf are getting through. Just to use one example, there are over 18,000 employees in D.O.D. performing audit and investigative functions and some $500 million is spent annually to support their activities. Yet these personnel are spread over at least 18 different agencies with D.O.D. and until recently there were some eleven coordinating committees to ensure cooperation among the various audit organizations in D.O.D. Clearly, there is no 'rapid deployment force' when it comes to controlling waste and fraud in D.O.D. but rather a mixed jumble of, in many

7. Hereafter referred to as the Part 2 Hearing.

cases, uncoordinated agencies and programs.

. . . . .

We must have a strong, statutory Inspector General in place in D.O.D. as soon as possible.

. . . . .

We can't accept fraud in D.O.D. programs, like that which may have resulted in over 80 percent cost overruns for the overhaul of Navy ships, recently, without establishing better mechanisms for controlling fraud. We cannot tolerate bad management practices and effective service coordination without creating an inspector general to systematically review inter-service management and push for improvements".

And Senator Bentsen said at page 8: "Everyone, in other words, knew that there was waste in that huge appropriation, but we didn't know where to find it. With an *independent inspector general* at DOD, we'll all be in a better position to monitor how the hundreds of billions of dollars we appropriate every year for defense are being spent." (Emphasis supplied).

When the dissatisfaction of certain Senators became more manifest and a new amending bill to create an IG for the DOD became more realistic, it appears that the Secretary of Defense also presented a bill which, according to the Senators, would merely have continued on an IG as an employee of the Secretary of Defense. This the Senators did not accept.

At the second hearing the Senators practically accused the Defense Secretary of being antagnostic to the bill which would have created an independent IG, primarily because the Secretary wanted to have control over the IG.

The Senators on the Committee argued that if the Secretary had control over the IG and could tell him what to do or what he should not do, then he would not be independent. They stated that they would not stand for that. They wanted an independent IG.

Deputy Secretary of Defense, Frank Carlucci, argued that the Secretary of Defense should have the power of veto over any matter which the IG would want to process, because of certain problems which would affect the welfare and security of the United States.

Senator Prior voiced his fear and stated that he didn't think that speaks of independence. Senator Eagleton and others voiced their apprehensions to Mr. Carlucci's testimony, and that if the amendment as requested was approved, it would be merely a "cosmetic" approach.

When the amending statute of 1982 was finally enacted, Congress yielded in part to the Secretary of Defense by permitting him a veto power only of such matters as dealt with security in defense but not otherwise. But even in the veto power the Secretary was required to report the facts of the case to Congress within thirty days.

## THE DEFENSE CONTRACT AUDIT AGENCY (DCAA) RULE

Did the Senators in the hearing before the Committee on Governmental Affairs in the United States Senate Second Session, Part 2, on March 25, 1982, contemplate that the DCAA would under the new IG Amendment be an unrelated agency in the Defense Department family of agencies without any obligations to the IG to be? Did the Senators of the Committee at the Part 2 hearing intend that the IG should have no relationship with, or use of the facilities and resources and personnel of the DCAA as with all other component agency parts of the DOD?

Inasmuch as the respondent imputes a lack of cohesiveness of the DCAA within the entire family of defense agencies, it is noteworthy that the Senators discussed DCAA's significance in the 1978 Report.

On page 2694, it is stated:

"... DCAA does have significant auditing responsibilities, and in the past there has been no systematic cooperation between DCAA and DAS. For example, if DCAA discovers that a contractor is pur-

suing a course of action which amounts to fraud against DOD, DCAA will share that information with the contracting officer but ordinarily no contact is made with DAS which has the primary responsibility for internal audit of the Department of Defense."

Thereafter the report discusses internal strife and a lack of communication. The Committee said (at page 2696):

"But the deficiencies which exist intensify the committee's belief that the Secretary of Defense, and Congress, need a strong and independent auditing and investigative capability at the OSD level".

Since the GAO[8] reported important improvements by the service itself "to upgrade the placement of auditing in the service and to remove all restrictions on the functioning of the service audit agencies", the Committee recommended that no "organizational changes be made in the service audit and inspection functions". Then, at the 1982 Act Amendment hearings, this problem was blared out loud.

The respondent objects to the action of the IG's subpoena of the respondent's internal audit reports on the theory that it is a device which furthers the ulterior purpose of the DCAA. Accordingly, we should better understand the complex parts of the DOD, and particularly the DCAA. In a conversation between Sherick and Senator Eagleton, the Senator said (Report, page 27): "... there are some 18,000 individuals in the Department of Defense that in one form or another have something to do with auditing, investigating, accounting and the like"; that "there are about 4,000 support people"; that this "included the Defense Contract Audit Agency"; that "[t]here is an inspector general for each of the services"; and that each of the following have inspector generals: the Army, Navy, Air Force, Marine Corps, Defense Communications Agency, Defense Intelligence Agency, Defense Logistics Agency, Defense Mapping Agency and Defense Nuclear Agency. A summary sheet was prepared for the Committee which is reflected in the Report, page 29. In total the figure for auditors was 13,389 professionals; 4,426 support people; and 2078 augmentees. All were under the command and control of the Secretary. The Senators discussed the DCAA thoroughly at the hearings as is reflected from pages 30 through 39.

The Committee was told by Sherick who was then the Assistant to the Secretary of Defense for Review and Oversight that these were experienced auditors and "[t]heir expertise is generally across the board in the evaluation of proposals and the post-award audit of the contract that eventually comes out of that proposal". (Report, page 32). Senator Eagleton asked Sherick whether his statement would be a fair conclusion and he was told that it would. The statement reads as follows:

"... In short, the large part of DCAA's responsibility is pre-award work. They are not necessarily looking at whether fraud or waste has been committed after a contract has been entered into. They are advisers and not necessarily skeptical critics of the contracting officers, and the contracting processes". (Report, page 32).

Sherick supplemented this with "they are critics in the sense that they disallow and question costs on contracts. That is their job. They do not review the contracting process; that is the function of the internal audit agencies".

As relates to privileged communications, the matter was discussed before the Committee (Report, page 35), and the answer to Senator Eagleton by Sherick was "I think there may be privileged contractor data. DCAA is looking at the contractor's proposal, and looking at important information that is competitive in nature and shouldn't be revealed. Beyond that I think all the proposals are open to audit".

Senator Eagleton said he understood and summarized his concerns as follows (Hearing, Part 1, page 38):

8. General Accounting Office

First, that an office which performs in certain ways "is destined to be a weak office without adequate resources and without a substantial mandate in the very important area of defense contract and procurement ...";

Second, that the DCAA should not be regarded as sacrosanct;

Third, that the DCAA lends a very valuable service in the advisory role to negotiating contract officers who need such auditors at their sides with "a tough auditing capacity"; and

Fourth, that "... We still need, once you get beyond the advisory role, a tough auditing capacity ..." and that most auditing "is not auditing at all; it is financial negotiating advice that is given to the negotiating team".

Sherick then made the comment (Hearing, Part 1, page 38), that "They (DCAA) have a reputation for being very professional people".

In the Hearing, Part 1, page 40, in one of the written questions of Senator Roth to Deputy Secretary Carlucci, part of the question asked was "... what is being planned to make the DCAA more effective and what role could the proposed Inspector General plan in making this office more effective?" A part of the answer was "... The proposed Inspector General is charged with evaluating and monitoring contract audits and should thereby be able to assist in improving DCAA's effectiveness".

In a written question by Senator Roth to Deputy Secretary Carlucci, who was insisting that the DCAA belonged with the advisory staff of negotiators for the DOD, even he agreed that if the DCAA was not included in the transfer of offices, the Senate could not be assured that the contract audit principles would be effectively managed and reviewed by the IG.

At page 34 of the Hearing, Part 1, it was stated that DCAA audit reports were not always acted upon. And when Senator Eagleton, talking about the performance of DCAA with regard to the report of the GAO, asked in effect of Sherick, the contemplated IG, what would you do to eliminate the problem of the DCAA auditors having too close a relationship with the contractors and not being as vigilant as it should be in its auditing and examining of the records, Sherick said, "I have oversight and evaluation over DCAA and I will look into that matter". (Hearing, Part 1, page 35).

Sherick further answered (Hearing, Part 1, page 34), "That is one of the things I will look into to find out why price negotiating memoranda are not being written and why are they not addressing the auditors' problems and recommendations. He owes it to the auditor to say why he did not take that advice". Senator Eagleton then responded, "I hope you will use your influence, Mr. Sherick, to see that it is rectified. It has been a continuing problem ...".

At the Hearing, Part 1, page 37, Senator Eagleton pointed out that the DCAA and also the negotiating contractors and the government contract auditors had limited their own access to some important information, and that "Contrary to both DOD policy and regulations and public law, contract auditors are not always provided with the information necessary to review contractor pricing proposal or contractor cost. Contractor auditors may have compounded the problem by entering into agreements which have limited their own access to contractor data". All the other Senators echoed this concern that DCAA was not getting all the information to execute its proper functions.

The IG Amendment of 1982 did not come by quickly or by unanimous thinking. Various versions in both the Senate and House were argued, mulled over and amended. But the Senate also had some versions backed by the DOD which resisted an independent IG. At the bottom of these versions the main concern was whether the IG was to remain as a DOD employee under the control of the Secretary, or whether a presidentially appointed IG was to be created as an independent official working in that Department with the Secretary.

The second and lesser amount of argument related to the DCAA. There were those who argued that DCAA should continue as in the past and those, who eventually prevailed and who backed the idea that the DCAA should be as it is, an agency in the DOD belonging with the other agencies in the Department and under the guidance and direction of an independent IG.

THE INSPECTOR GENERAL AMENDMENT OF 1982

The mood and thinking of the Senators who favored a powerful and independent IG for the DOD during the Part 2 Hearing especially and eventually permeated Congress and it enacted the Amendment of 1982 as it presently exists.

It is significant that while the 1982 Amendment creates inspector generals for the Department of Justice, Treasury and Defense, it provided that the first two remain exactly in the same category as all other inspector generals created by the Act of 1978. But it is noteworthy that it made significant changes found in § 8 for the DOD. That reads as follows:

"4. . . .

(c) In Addition to the other duties and responsibilities specified in this Act, the Inspector General of the Department of Defense shall—

(1) be the principal adviser to the Secretary of Defense for matters relating to the prevention and detection of fraud, waste and abuse in the programs and operations of the Department;

(2) initiate, conduct and supervise such audits and investigations in the Department of Defense (including the military departments) as the Inspector General *considers appropriate;*

(3) provide policy direction for audits and investigations relating to fraud, waste, and abuse and program effectiveness;

(4) investigate fraud, waste, and abuse uncovered as a result of other contract and internal audits, as the Inspector General *considers appropriate;*

(5) develop policy, monitor and evaluate program performance, and provide guidance with respect to all Department activities relating to criminal investigation programs;

(6) monitor and evaluate the adherence of Department auditors to *internal audit, contract audit* and *internal* review principles, policies and procedures;

(7) develop policy, evaluate program performance, and monitor actions taken by *all components of the Department in response to contract audits,* internal audits, internal review reports and audits conducted by the Comptroller General of the United States;

(8) request assistance as needed from other audit, inspection and investigative units of the Department of Defense (including military departments); . . ." (Emphasis supplied).

A proper understanding must be had of the difference between § 8 of the Inspector General Act of 1978 and that in the Amendment of 1982.

The Act of 1978 did not create an inspector general for the DOD. All it did was to authorize the Secretary of Defense to provide his own inspector general. This had come about because of the opposition of the Defense Department to the creation of an IG equal to those of other departments. In order to take care of the situation Congress in the 1978 Act then gave special instructions to the Secretary of Defense. Primarily, it required the Secretary to submit to Congress semi-annual reports summarizing the activities of the auditing and investigative units of the department, which Congress, numerically and alphabetically detailed, and § 8(5)(c)(1) authorized the establishment of a task force "to study the operation of the audit, investigative, and inspection components in the Department of Defense which engage in the prevention and detection of fraud, waste, and abuse . . ." It provided further of the rights and powers of the task force and regulated its functioning.

It provided also that the task force submit a final report to the Secretary of Defense and the Director of the Office of Management and Budget, who may in the form of addenda, provide additional information, which the Secretary shall submit to Congress.

Section 8 of the Amending Act of 1982 deals exclusively with IG of the DOD, and while it turned over to the new IG the functions of task force, it prescribed detailedly what the powers were that had been granted to the IG.

It is noticeable that the IG of the DOD was given, when requested as needed, assistance "from other audit inspection and investigative units of the Department (including the military departments)". The DCAA not being excluded was thus included within the whole family of agencies in the DOD. By including the DCAA we see the working of Congress to enable the IG to do that which he was intended to do.

Sherick promised Senator Eagleton that "I have oversight and evaluation over DCAA ...", (Hearing Part 1, page 35), and as the IG of the DOD he has proceeded to effectuate full control and guidance over the DCAA.

RESPONDENT'S CONTENTIONS

The many contentions of the respondent in its defense resisting the issuance of the IG's subpoena revolve in the main about two objections. First, that the pronouncement of the Supreme Court in the *Merck* case, *infra,* is the law of this case; and second, that Congress pronounced such action as being practiced by the IG now for the benefit of the DCAA to be improper. Several other contentions are also argued.

*The Merck Case.* The respondent and Amici rely heavily on *Bowsher v. Merck & Co., Inc.,* 460 U.S. 824, 103 S.Ct. 1587, 75 L.Ed.2d 580 (1983), to the effect that the Supreme Court said that the Comptroller General could not have access to indirect costs of a contract. The *Merck* case had three fixed-price negotiated contracts with the Defense Supply Agency and the Veterans Administration for the sale of pharmaceutical products. The prices were based on those in Merck's catalog. The contracts were negotiated rather than awarded after formal advertising. A negotiated contract is the method authorized by the statute for use in situations in which formal advertising and bidding is deemed impractical or unnecessary (See footnote, page 827, 103 S.Ct. page 1590). Each contract contained a standard access-to-records clause granting the Comptroller General the right to examine *directly pertinent* records involving transactions relating to the contract. In reliance upon these, the Comptroller General issued a formal demand to Merck for access to a series of documents and records *directly pertinent* to the contracts.

The district court, after the Comptroller General sought enforcement, rejected Merck's argument that the costs records were not *directly pertinent* to the fixed-price contracts. Merck also expressed concern in participating with the Comptroller General's demand without adequate assurance of the confidentiality of the cost data which it was requested to supply.

The Supreme Court held that the statutory language "directly pertinent" [9] as authority to the Comptroller General had a restrictive meaning in which Congress intended to prevent "snooping" of private businesses, as was reflected in the Congressional Report.

So far as the instant case is concerned, it is to be noted that the Supreme Court was not unmindful that Congress sought in granting the GAO access authority to equip that agency with a tool to detect fraud, waste, inefficiency and extrava-

9. The language which the Supreme Court interpreted is from the statute in these words:

"(b) except as provided in subsection (c), each contract negotiated under this chapter shall provide that the Comptroller General and his representatives are entitled, until the expiration of three years after final payment, to examine any books, documents, papers, or records of the contractor, or any of his subcontractors, that *directly pertain* to, and involved transactions relating to, the contract or subcontract". 10 U.S.C. § 2313(b). (Emphasis added).

gance in Government contracting generally. Justice O'Connor handed down the opinion and said (at page 834, 103 S.Ct. at page 1593). "Obviously, broad access to cost records would enhance the GAO's ability to evaluate the reasonableness of the price charged the Government and to identify areas of waste and inefficiency in procurement".

But because the congressional intent was to protect the privacy of contractor's records involving non-governmental transactions, the government was precluded from inspecting records of indirect costs. Indirect costs were said to be costs incurred in the area of research and development, marketing and promotion, distribution, and administration, which are not directly attributable to a particular product (at page 826, 103 S.Ct. at page 1590). The court determined finally that (at pages 844–45, 103 S.Ct. at pages 1599–1600):

> "Because of the GAO's mandate to detect fraud, waste, inefficiency and extravagance through full audits of Government contracts, we cannot accept Merck's view that the only records directly pertinent to the four fixed-price contracts at issue are those necessary to verify that Merck actually had an established catalog price for the item procured, that it sold the items in substantial quantities to the general public at the catalog price, that it delivered the product specified, and that it received from the Government no more than the amount due under the contract. On the other hand, given the policy of protecting the privacy of the contractors' business records also expressed in the statutory language and legislative history, neither can we accept the Government's contention that it must be permitted access to *all* of Merck's cost records". (Emphasis supplied).

The present situation is different. The statutes creating the Inspector Generals and their specific powers, especially that of Inspector General of the Department of Defense, contain no limited or restrictive power such as was imposed upon the Comptroller General. There is only a specific veto power imposed on the Inspector General for Defense as it relates to matters of national security when the Secretary may veto the action of the Inspector General and report fully to Congress within 30 days of the circumstances involved and his reasons for the veto. Otherwise, the statute creating the Inspector General of Defense is lavishly concerned with the extraordinary independent, capability and potency of the Inspector General. The Secretary did not veto the instant action of the IG.

*The Subpoena is Improper.* The respondent maintains that the IG may not use the subpoena power in behalf of any other component of the DOD agencies and that includes the DCAA. On this basis it cites the Congressional Senate Report 95–1071, at pages 2676, 2709 of the enactment of the 1978 Inspector General Act. That reads as follows:

> "The Committee intends, of course, that the Inspector and Auditor General will use this subpoena power in the performance of his statutory functions. The use of subpoena power to obtain information for another agency component which does not have such power would clearly be improper".

Congress had its reasons for omitting the power of inspector generals of the various agencies created under the Act of 1978, in an effort to control, limit and restrict each inspector general within that particular department to not interfere with any other department through any of its agencies. Under the Act of 1982, the IG was given overall power within the DOD of all agencies which composed it. It would seem that the respondent would put the DCAA in the category of an independent functionary over which the IG could have no authority.

In the wording of the Defense IG's authority in § 8 we see that the IG is given power to "*initiate,* conduct and supervise such audits and investigations ..."; and to "monitor actions taken by *all components of the Department* in response to contract

audits, internal audits, internal review reports"; to "request assistance as needed from other audits, inspection and investigative units of the Department of Defense (including the military departments)", (Emphasis supplied), as he considers "appropriate". And thus while the respondent argues that the DCAA is an independent component of the DOD, it is completely available for use when called upon by the IG both as a source of information and to carry our investigative delegations and assignments. Additional provisions in the 1982 Amendment give the IG powers in all agencies of the DOD, including the "military".

While Congress did not intend that any IG created by the 1978 Act would act as a rubber stamp, automatically approving and issuing subpoenas for the use of other departments, it also did not intend to restrict the IG's own investigations, intra-departmentally no matter how they were commenced but the DOD had no IG as of that time.

There is no similar Congressional expression for this intra-agency prohibition of lending subpoena power in the 1982 Amendment which created the IG for the DOD. However, from the numerous and forceful statements of the legislators, as well as from the text of the 1982 Amendment, it is clear that the various auditing or watchdog agencies within the DOD were not intended to operate in a vacuum. Congress indicated that if an investigation by one agency should kindle the interest, duty or even curiosity of the IG, himself, to investigate a contractor, he should not be prevented or discouraged.

*Collateral Processing.* The respondent contends that because it appealed a decision of the DCAA regarding its demands for documents as to the Armed Service Board of Contract Appeals, ASBCA No. 30593, as of January 9, 1985, the IG of the DOD could not interfere with that process. The 1982 Inspector General Amendment states nothing at all about proceedings which would terminate or otherwise interfere with the IG's independent powers to proceed to initiate, conduct and supervise such audits and investigations as he considers appropriate.

Whether or not the DCAA, itself, has any rights to access of such records as demanded, which the respondent refused, is of no concern to this enforcement proceeding. While the Armed Services Board of Contract Appeals may have the right and may eventually make a determination that the DCAA as an agency must pay for audits after requesting certain documents from the respondent based upon clauses in the contracts and by regulations, and may therefore grant or deny the respondent's appeal, that would not affect the IG's right to investigate and of the right of the IG even to use the DCAA as his own personnel in initiating, conducting and supervising such audits and investigations, as he considers appropriate. There is no substantial connective basis by which the respondent may indicate that its preliminary appeal to the Armed Services Board prevents and estops the statutory right of the IG to proceed in this case, since that appeal does not affect the power, authority, or purpose underlying the issuance of the IG subpoena. Therefore, the fact that the respondent has taken an appeal is not an issue here and does not deprive the IG of the right to look at the respondent's internal audit reports, as part of his own investigation.

The IG was given independent authority to act in the manner in which he considered appropriate, even if such matters were collateral to any other proceeding, say for instance, the IRS. The provisions and regulations governing appeals to the Armed Service Board of Contract Appeals constituted an independent process which permits the adjudication of contract disputes under certain circumstances.

The 1982 Amendment leaves no doubt that the intention of Congress in authorizing investigations supported by subpoenas and enforcement of subpoenas was intended to enable the IG to discover and procure evidence and not to prove pending charges or complaints. Similarly, the administra-

tive apparatus established by Congress for other agencies was intended to delegate effective power to investigate certain matters within the scope of their authority. *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

*Scope and Subject of Subpoena.* The respondent contends that the scope of the subpoena is too broad. Because of the manner in which audits are conducted by the respondent's internal audit department, where the audits encompassing defense contracts are not segregated from the other internal audit reports, the respondent would be required to produce 920 audit reports out of a total of 1,171 audits performed during the period between January 1, 1982 through October 1, 1984. The government seeks only internal audit work involving costs charged to the DOD. However, because of the intermingling of information pertaining to defense contracts, the respondent alleges that disclosure would compromise confidential matters not related to defense.

The Supreme Court has consistantly held in summons enforcement proceedings, particularly involving the IRS, that "absent unambiguous directions from Congress" restrictions upon summons power should be avoided. I find that in the instant case, based upon the language of the statute as well as the legislative history previously quoted, Congress has similarly made a policy choice in favor of disclosure of all relevant information, and for the IG to have a "broad latitude" in deciding what materials are necessary. *United States v. Arthur Young & Co.,* 465 U.S. 805, 104 S.Ct. 1495, 1502, 79 L.Ed.2d 826 (1984).

The respondent argues that their internal audit reports have confidential and candid information relating to their non-defense contracts intermingled with DOD related data and evaluations, and that it would be detrimental to their interests to disclose any of these reports to government auditors. However, the corporation does provide these internal audit reports to their independent certified public accountants, who perform a "public responsibility" which transcends their employment relationship with the client. *United States v. Arthur Young & Co., supra,* at 1503. Similarly, the IG must perform his public responsibility in examining the internal audit reports and has assured the court that it will do so with due consideration with the concerns of the respondent, and with personnel that have been cleared for highly sensitive matters.

In *United States v. Noall,* 587 F.2d 123, 126, C.A.2, 1978, the government on behalf of the IRS sought to examine all of the internal audit reports and related work papers of a corporation for certain periods. Although the corporation objected that the materials sought were confidential and reflected their operational plans and procedures, and that the reports might contain "hearsay rumors, [and] opinions", the Court of Appeals for the Second Circuit ordered their production. The court stated that what the internal auditors reported "might throw light" on the correctness of the corporate tax returns, and that since Congress has decided the policy issue it is not for the courts to challenge that determination. The court rejected as unpersuasive the argument that requiring production of internal audit reports runs counter to public policy because of the possible inhibition on full and frank disclosure by the internal auditors. In the instant case, I find that the public policy of preventing fraud, waste, abuse and mismanagement of public funds, so forcefully articulated by Congress, outweighs any possible "chilling effect" on the internal auditors with regard to their duties.

The IG is seeking:

"Any and all documents generated by the Westinghouse Electric Corporation internal audit department including those related to its budgeting and planning, as well as operations and allocations of its costs to segments having Government contracts. The documents should include, but not be limited to schedules of audits, working papers generated during the audit, written reports summarizing

the results of audit, followup action taken to implement the recommendations, and personnel records documenting the time spent by the employees assigned to the internal audit department." (Document No. 1, Appendix A).

The scope of his investigation is limited to "Government Contracts" and such a request is sufficiently specific for the respondent to be fully aware of what is required to be in compliance with the subpoena. These documents will enable the IG to discover whether there have been instances of mischarging, and whether the respondent has diligently searched for and remedied any incidents of misconduct or wasteful practices found.

It was the choice of the respondent to intermingle the operational funds of the government contracts with those of its private sector contracts. It is the government's own funds which it has never been able to audit. If the respondent had kept separate its own corporate business from the government contract business in its internal audit operations, it might have presented the argument here that the IG could not intrude upon its corporate reports. But the respondent was the one who chose to intermingle the government's operational auditing with its own. That in effect made the total reports matters of interest and concern to the government because its funds were involved to whatever degree in those reports.

It voluntarily took $554,000 in 1982 and what may have been similar amounts in the other required years for auditing, and by this means it sold its right to secrecy and opened the door to the government and its right to inspect the internal audit operational reports. What the DOD bought and paid for is of concern to the IG and to the public at large; and even though the IG speaks of it only passingly, it becomes a fundamental part of the IG's functions as Congress declared it to be in the IG statutes.

The IG must perform his public responsibility in examining the internal audit reports and has assured the court that he will do so with due consideration of the concerns of the respondent, and with personnel that have been cleared for highly sensitive matters.

*Enforceability of Subpoena.* The respondent contends that the legal requirements to establish the enforceability of an administrative subpoena have not been met. The Supreme Court has required that the investigation and subpoena by the administrative agency be for a legitimate purpose, that the inquiry be reasonably relevant to the purpose, and that the demand should not be too indefinite, too broad, or unreasonable. *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964); *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208–09, 66 S.Ct. 494, 505–06, 90 L.Ed. 614 (1946); *Endicott Johnson v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943).

The cases have carefully distinguished between the limitations on a judicial subpoena and the broad latitude that must be given to an administrative subpoena. An administrative agency "... has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not". *United States v. Morton Salt Co., supra,* 338 U.S., at 642–43, 70 S.Ct. at 363–64.

It is not necessary for the agency issuing the subpoena to have "probable cause" to believe that a violation has occurred. "... Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest". *United States v. Morton Salt Co., supra,* at 652, 70 S.Ct. at 368.

I find that the subpoena was issued for a legitimate purpose within the permissible area of the IG's authority. At the time of the issuance of the subpoena the weight of the evidence abundantly demonstrates that the IG had: personal interest, "official curiosity", and "suspicion", that the lack of production of respondent's internal audits, and the other surrounding circumstances involving this contractor, required an investigation to discharge his responsibilities to the DOD and the public.

The documents sought from the respondent, as outlined in Appendix A of the IG subpoena, supra, have been detailedly set forth. The arguments that the subpoena is not reasonably relevant to the IG's statutory purpose, is not specific enough, or is unduly burdensome, are all without merit. Both the IG and his deputy testified that it was of paramount importance to examine "the effectiveness of the internal controls". (Document 18, page 73). The better those internal controls are, the less audit work is required, and the less risk there is to the government and the public. (Document 18, at pages 74–75). It has been repeatedly established that having these documents will save the DOD the cost of duplicating these efforts, and more importantly they will demonstrate how effective the respondent has been in discovering instances of fraud, waste or mismanagement, and how effective the remedies undertaken by the respondent have been. It would be difficult to imagine any inquiry more relevant to the IG's statutory purpose.

As to whether the subpoena is too broad, too indefinite, too burdensome, or unreasonable, I have previously found that the documents sought in Appendix A of the IG subpoena were described in sufficient detail and reasonably related to the IG's investigation. It would be needless to put additional matters into the subpoena to lengthen it more than it is. As for its breadth, it is no different from what a civil complaint filed in court may have. It is inclusive, but not overly broad. Additionally, the indication of the IG's purpose contained in the subpoena is sufficient for me to evaluate the reasonableness of the documents sought in light of the IG's administrative duty. The respondent attacks the subpoena as lacking in specificity, and also that it is too broad. I shall no further comment.

*The Subpoena is Sidetracked by the Respondent's Appeal.* The respondent contends that because it appealed a decision of the DCAA regarding its demands for documents to the Armed Service Board of Contract Appeals, ASBCA No. 30593, as of January 9, 1985, the IG of the DOD could not sidetrack that process by his subpoena. The 1982 Inspector General Amendment says nothing at all about proceedings which would terminate or interfere with the IG's independent powers to proceed to initiate, conduct and supervise such audits and investigations as he considers appropriate.

Whether or not the DCAA, itself, has any rights to access of such records as demanded, which the respondent refused, is of no concern to this enforcement proceeding. While the Armed Services Board may have the right and may eventually make a determination that the DCAA as an agency must pay for audits after requesting certain documents from the respondent based upon the clauses in the contracts and by regulations, and may thereafter grant or deny the respondent's appeal, that would not affect the IG's right to investigate and use the DCAA as his own personnel in initiating, conducting and supervising such audits and investigations, as he considers appropriate. There is no substantial connective basis by which the respondent may indicate that its preliminary appeal to the Armed Services Board prevents or estops the statutory right of the IG to proceed in this case, since that appeal does not affect the power, authority, or purpose underlying the issuance of the IG subpoena. Therefore, the fact that the respondent has taken an appeal is not an issue here and does not deprive the IG of the right to look at the respondent's internal audit reports, as part of his own investigation.

The IG was given independent authority to act in the manner in which he considered appropriate, even if such matters were collateral to any other proceeding, say for instance, the IRS. The provisions and regulations governing appeals to the Armed Service Board of Contract Appeals constituted an independent process which permits the adjudication of contract disputes under certain circumstances.

The 1982 Amendment leaves no doubt that the intention of Congress in authorizing investigations supported by subpoenas and enforcement of subpoenas was intended to enable the IG to discover and procure evidence and not to prove pending charges or complaints. Similarly, the administrative apparatus established by Congress for use of other agencies by the IG was intended to delegate effective power to investigate certain matters within the scope of his authority. *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

*The Subpoena is Too Burdensome.* The respondent states that compliance with the subpoena would require approximately 3700 hours of effort and $55,000 in direct reproduction costs (although the government has not required that the documents be copied, only made available for inspection), in order to produce the 920 internal audit reports that relate to DOD contracts. This process, according to the respondent, would be extremely disruptive of their internal audit process in terms of diversion of personnel, and the temporary loss of access to records.

In *United States v. Firestone Tire & Rubber Co.,* 455 F.Supp. 1072 (D.C.D.C., 1978), the National Highway Traffic Safety Administration sought different types of records over a four-year period. Firestone complained that compliance would entail 100,000 hours of work and $2,000,000, which would be unduly burdensome and unreasonable. The court, nevertheless, upheld the subpoena. Quoting *F.T.C. v. Texaco, Inc.,* 555 F.2d 862, 882, C.A.D.C., 1977, cert. den. 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), the court summarized the relevant considerations:

> "We emphasize the question is whether the demand is unduly broad. Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest. The burden of showing that the request is unreasonable is on the subpoenaed party. Further, that burden is not easily met where, as here, the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose. Broadness alone is not sufficient justification to refuse enforcement of a subpoena. Thus courts have refused to modify investigative subpoenas unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business." 455 F.Supp. at 1083–84.

I find that the subpoena in the instant case has not been shown to be unreasonable or unduly burdensome. If there were reasons for modifying the subpoena to avoid an unjust burden on the part of the respondent, it would have been in order for the respondent to come for a protective order from the court. But it would be difficult to see how any protective order could be had segregating only government related matters when the respondent chose to combine and intermingle them with its own audit operations.

The IG has been available and continues to remain available to discuss and implement methods to reduce the inconvenience of the respondent in compliance. As the respondent has pointed out the government has auditors already on site at many locations and could work with the respondent to facilitate the review and production of the relevant internal audit reports.

*Credibility of Inspector General.* Counsel presented by means of a lighted shadow box, three documents separately. The first was Stipulation Exhibit 1, which was the August 14, 1984 request by the DCAA to the IG for the issuance of a subpoena duces tecum; the second, Stipulation Exhibit 2, was the more detailed Au-

gust 16, 1984 request by the DCAA for the issuance of a subpoena; the third, Respondent's Exhibit S-3, the letter dated September 27, 1984, which the IG sent to the DCAA stating that he would issue the subpoena to the respondent.

Counsel's argument was to the effect that the IG has the power for issuance of a subpoena for only his "own" investigation, but that he did not have any power whatsoever to issue a subpoena for any agency within the DOD, and especially for the DCAA, because the DCAA, he contended, was independent and in effect a neutral agency for the purpose of obtaining and giving information to the contract audit processings.

Much has been quoted here from the hearings of the Committee on Governmental Affairs, Part 2, supra, indicating that the DCAA was an agency of the DOD, was not sacrosanct, had been ineffective in its performance, and after much debate, the intent of Congress was expressed to place the DCAA under the guidance and direction of the IG. I find that in the course of exercising his oversight powers he invited the submission of particular problems or inquiries after which he would determine whether or not to launch his own investigation. Therefore, it is critically important in any review of this process to analyze the credibility of the IG and discuss his motivation for issuing the subpoena.

As for counsel's argument that the IG did not issue the subpoena for "his own purpose", but only for that of the DCAA, it is difficult to understand what counsel could possibly mean by the IG's "own" purpose, since Congress had given him the overall departmental jurisdiction and mandate to ferret out fraud, waste and mismanagement. The evidence demonstrates that the IG's purposes were just that, and within the discretion which the IG considers "appropriate". The IG has only a small department of his own but was given the right to use the resources, equipment and personnel of every agency, including the DCAA, all of which Congress constituted as his servants, when the IG considers it appropriate to use them. And thereafter, lacking uncommitted personnel of his own, using the DCAA personnel in this case was in accordance with the power and discretion which Congress bestowed upon him.

The respondent contends that the IG invited all of the DOD investigative divisions under his control to use his subpoena power as a "tool" for their access to records, that the DCAA did indeed request the issuance of a subpoena in an investigation of the respondent, and that the IG did automatically issue the subpoena not for his own investigation, but for the DCAA. Counsel for the respondent urges the court to look only at the contemporaneous but terse memoranda between the IG and the DCAA.

The respondent charges that the memoranda in question do not state their true purpose but merely recite general statements as to their statutory purpose. The critical phase for the respondent is in the September 27, 1984 memorandum from the IG, in which he requests the assistance of the DCAA in executing the subpoena and further requests that the DCAA continue its audit into these matters indicating, according to the respondent, that the IG was merely handing over an illegal subpoena to the DCAA (Document 34, pages 296–297).

I must look to all of the evidence, however, and particularly to evidence characterizing the motivation of the IG. I found the IG to be a highly credible witness. I believe the IG's statements: that he was "appalled" by the lack of cooperation by the respondent; that the DCAA audit was taken over by himself; that "I did not ever think that my subpoena was a tool of DCAA. It is not a tool of anybody's but me".; that he provided for Michael Eberhardt, Assistant Inspector General, to report directly to him as to the progress of the audit; and that he would do all in his power to protect the confidentiality of the documents disclosed.

After counsel for the respondent accused the IG of using his subpoena power for the coercive use of the DCAA, as it maintained, the August 14, 1984 Memorandum, Exhibit

1; the August 16, 1984 Memorandum, Exhibit 2; and the IG's letter dated September 27, 1984, Exhibit S-3, proved the IG had to come to an understanding with the DCAA to help it coerce the respondent into producing the internal audit reports. Counsel for the respondent asserted that these were proof of a combination for an understanding between the two parties for an "ulterior" purpose. I then put the question to counsel for the respondent of whether the IG was "worthy of credibility". He honorably responded that "I, like Your Honor would have difficulty in finding that an officer of the executive branch is lacking in credibility". If the contention of counsel that there had been a collusion between the IG and the DCAA are true, then the IG's testimony before me at the deposition would have to be false. As the judge of credibility, I did not have any difficulty, as counsel for the respondent hesitated to state, in finding that the IG's vociferous description of his purpose in issuing the subpoena was true.

*Burden of Proof.* The Supreme Court has held that in challenging an administrative subpoena on appropriate grounds, the burden of showing an abuse of process is on the respondent. In the case of an IRS summons, where motivation of the "good faith" of an agency becomes an issue, the burden of disproving a valid purpose on the part of the issuer is a "heavy one". *United States v. LaSalle National Bank,* 437 U.S. 298, 316, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978).

The Court of Appeals for this Circuit in *N.L.R.B. v. Interstate Dress Carriers, Inc.,* 610 F.2d 99, 112, C.A. 3, 1979, stated that in opposing an enforcement proceeding involving an N.L.R.B.'s subpoena: "Of course, the burden on the party to whom the subpoena is addressed is not a meager one. [Citing *LaSalle National Bank, supra* ]. It must come forward with facts suggesting that the subpoena is intended solely to serve purposes outside the purview of the jurisdiction of the issuing agency". (citations omitted).

While the respondent presented its evidence mainly by the affidavits and documents procured in discovery, it relied heavily for its defense that the IG and DCAA arrived at the expedient of forcing the respondent to reveal its internal audit reports to the DCAA by means of the IG's subpoena power.

In deposing before the court the Deputy Inspector General Curry almost the entire substance dealt with the fact that the DCAA had made a study of 28 company locations to show that it was not entirely a popular request to companies for the compliance of divulging the internal audit reports. While it may not have been totally acceptable to the 28 company locations studied, we must remember that the DOD dealt with 200 companies and with their subcontractors. And so the study is not a fair evaluation of popularity; but popularity has nothing to do with this matter before me now.

What the DCAA did in previous years and how it related to various contractors was before the 1982 Amendment. What the IG has done with the subpoena power in this instance relates to the authority and the fairly mandated directions of Congress in the 1982 Amendment. So it is in the same way that the respondent argues that the DCAA had never received any of these reports for twenty years, or made complaints that the respondent had not given the reports, nor chose previously that the DCAA was entitled to its internal audit reports. This, of course, is no excuse for the respondent who no longer deals with the DCAA but with the IG. This is a new ball game in which the star player and the rules are altogether different from what they were before the 1982 authorized the IG to act. Therefore, this evidence has no persuasive value in furthering the belief that there was any stratagem used by the IG agreeably with the DCAA.

The second deposition was that of the IG and I need not repeat here the many statements which he made throughout his testimony (as he was being cross-examined by

counsel for the respondent). Yet a few references are in order.

At page 206 of the transcript:

"The Court: Did anyone at any time intercede in such a way as to pressure you into issuing this subpoena?

The Witness: No, sir. No, Your Honor."

"The Court: Did you, of your own free will and good conscience, examine the matters, the facts, the circumstances in such a way as they related to law and your functional duty before you issued the subpoena?

The Witness: Yes, Your Honor.

The Court: If the subpoena honored or enforced, is it your intention to sublet any of your powers, and I will use the word 'sublet' intentionally. Not delegate, but sublet your rights and authority and constitutional obligations to anyone else?

The Witness: No, sir."

When asked by the court who would assist him, the answer was

"I have 570 auditors that work for me and I have a contract audit group ... I would ask them to work with the DCAA to protect the record from that kind of violation." (Tr. page 209).

At page 210:

"The Court: In response to certain of its documents. Would you have the ability to respect, you through your agencies, and representatives, and your staff, would you have the capability of seeing that that was done in accordance with your oath of office and the duties and functions which Congress has imposed upon you?

The Witness: Yes, sir. I think that I have that capability. I deal with the most sensitive military programs in the Department of Defense and am cleared ... I have the same clearances as the Secretary of Defense. My people are all cleared for top secret".

At page 211, when asked whether he would be concerned in good conscience to see to it that none of the rights of Westinghouse would be violated, his answer was:

"Let me assure you, Your Honor, that I consider that a solemn trust and I would take the actions that are necessary to protect those records."

The court then asked:

"And again, you say, that the action that has occurred right now, in regards to the issuance of this subpoena, was solely that of your own determination?

And the witness answered: "That's right."

"The Court: Based upon what information you had and not to serve or subserve any other purposes?

"The Witness: "No."

"The Court: How about rights not to disclose certain information to DCAA?

The Witness: There are, if there are rights not to disclose involved with any paper, I would expect that Westinghouse would tell me that and I would certainly live up to that kind of a limitation".

Towards the end of his testimony, the witness volunteered this statement: (Tr. page 214)

"Your Honor, I would like to comment on one thing. There was no inference here that as a result of Congressional hearing that there would be pressure put on me. I want that—I would like to have it in the record that, you know, I'm independent of the Congress and the Department of Defense in carrying out my responsibilities. I have served the Government for over 40 years and I am more than eligible for retirement. That kind of inference bothers me because that's the last thing in the world that I would let affect my decision. And if it came to that kind of an issue, I would resign and I will not take that kind of ...".

Since the burden is upon the respondent to prove, by at least a preponderance of the evidence in its case, particularly in its attack of impropriety of the issuance of the subpoena and its ulterior motivation in doing so, and because all of the credible evidence, even though produced for the most part by the respondent, is on the side of the petitioner with very little weight on the side of the respondent, the respondent has

failed to convince the court that the petition for the enforcement of the subpoena should not be granted.

SUMMARY

With expressed antagonism against the overwhelming number of money grabbers, mismanagers and those who acquired public funds, through federal channels in the name of costs, expenses and profits, Congress finally broke out with exasperation to enact the IG statutes. Because the DOD was unique in its national security function, with so much of it integrated in confidentiality, and being the most costly part of the government wrapped up in fabulous hundreds of billions of dollars, Congress spent in excess of three years in finally arriving at a particularly devised medium to combat fraud, abuse, waste and mismanagement. And so it constituted an all powerful IG of the DOD (with additional powers compared to the other IGs) who would be virtually devoid of resources, facilities, equipment and personnel, and practically speaking, a pauper on budget allowances with only a nucleus of personnel. And, through the megical dexterity of Congress, all the resources, facilities, equipment and the nineteen thousand auditors and investigators in the scattered, disjointed DOD agencies were brought under the independent and discretionary authority of the IG who could more effectively combat fraud, waste, abuse and mismanagement.

After the enactment of the Inspector General Amendment, the President appointed Joseph H. Sherick, a dedicated and experienced public servant with a legal foundation, and more than 40 years of government service in the related fields; and the Senate confirmed him. He already had much knowledge of the perplexed state of affairs in the DOD because of the lack of integration among the many unsupervised department agencies.

In addressing the Senate Committee on Governmental Affairs Sherick said in a prepared statement that if he became the primary monitor of the DOD, he would be: (Hearing, Part 1, pages 44–45)

"(1) Working closely with the President's Council on Integrity and Efficiency to achieve coordinated, government-wide attacks on fraud and abuse involving more than one federal agency.

(2) Cooperating closely with Inspectors General in other civil federal agencies to insure that there is both an exchange of ideas on methods and techniques, as well as a careful coordination of any investigation or audit which involves DOD and these other agencies.

(3) Coordinating efforts of the Departments' auditors, Inspectors General and Criminal Investigative agencies, to achieve a uniform and balanced approach to rooting out or preventing fraud, waste and abuse.

(4) Developing new ideas and approaches in improving DOD operations and reducing fraud, waste or mismanagement.

(5) Placing emphasis on use of Hotlines and mail drops to report and expose instances of fraud or abuse."

He was, in effect, even then inviting the submission to his office of matters which might require his attention. Subsequently, he also invited any member of the public to inform him of potential DOD complaints by means of a "hotline" about which he testified. The IG knew what valuable services the DCAA provided to the contract officers within the Department. He also knew that there had been lacking a follow-up on many matters, often of moment, when the DCAA presented information to the appropriate agencies. Prior to the 1982 Amendment, the DCAA was a practically isolated and independent agency in the employment of the DOD under the supervision of the Secretary. The new IG required the DCAA to be more responsible.

Because of the minimal number of his attached auditing personnel, the IG was required to perform his duties using the personnel of those agencies best and most conveniently suited for the task of effectuating the IG's inquiry within the sphere or limitation of his purpose.

When the DCAA made its requests for a subpoena to compel the respondent to open

up its records for review by the DCAA, the IG gave the matter much study, communicated a possible compromise unsuccessfully with the respondent, and then after obtaining the necessary information for an appropriate discretionary determination, he issued a subpoena duces tecum to the respondent based upon his own investigation.

After a final hearing was had on May 15, 1985, in addition to the previous evidence of the depositions of the IG and the Deputy IG, the exhibits, affidavits, and finally the stipulation of the parties, the issue was clarified.

In order to invalidate the IG's subpoena, the highly competent and skilled counsel for the respondent (and the Amici in their briefs) eloquently proferred the story that the DCAA had conspired with or used a willing IG to accommodate it in doing that which it, itself, was powerless to do—to issue a subpoena duces tecum to the respondent—because the DCAA had wanted to coerce the respondent into revealing its internal audit reports; and so the IG issued the subpoena for the DCAA and not for the IG's "own" purpose.

The respondent and the petitioner admittedly agree that the request by the DCAA for the IG to issue a subpoena was in violation of nothing in either the 1978 or 1982 statutes, but seemingly of a Committee comment from the 1978 Congressional Report that "The use of the subpoena power to obtain information for another agency component which does not have such power would clearly be improper". 1978 U.S. Code Cong. & Ad.Report No. 1071, at page 2709.

In so arguing, counsel was intermixing dissimilar motivations for the 1978 Act and the 1982 Amendment. Was not the Committee referring to Department agencies other than that for which each IG served? The aim evidently of Congress was to circumscribe and confine each IG within his own department and to not intermeddle with the affairs of any other department through their personnel or agencies. Thus it was expected that the 15 IGs appointed under the 1978 Act would not cross departmental lines into other departments and so they would avoid conflicts and confusion.

The purpose of the 1978 Act was to consolidate audit and investigative functions within each department under a single, responsible official. There was no IG of the DOD created under this Act, to which the Committee comment could refer. Under the 1982 Amendment, instead of consolidating each DOD auditing agency, Congress allowed each to nominally remain, but placed them under the umbrella of a powerful and independent IG. The new Congressional scheme provided for the independent integration of all DOD auditing and investigative units within the descretion of the IG. The previous Committee comment does not apply to this situation.

The DCAA is not only a DOD agency, but the Act of 1982 placed it under the supervision and control of the IG for the DOD, and so no matter how imaginative one may be to infuse a plot between the IG of the DOD and the DCAA of the DOD as separate elements, it plainly lacks fundamental logic. In order to give the respondent's postulate any plausability, there must have been some worthy evidence of a prearrangement between the IG and some one or more responsible members of the DCAA. What the DCAA did and what the IG did shows no evidence of any improper, even fragmentary, collusion. The respondent presented no preponderance of evidentiary credibility that the "two" had entered into a scheme for compelling compliance by the respondent to produce documents for the exclusive purposes of the DCAA. The respondent called the IG for his deposition; and he appeared before me as an honorable and reliable witness. I find his unimpeached and uncontradicted testimony to be totally credible.

In addition to the primary contention by the respondent that the subpoena was issued for an improper purpose by the IG (on behalf of the DCAA and to coerce settlement of a related administrative dispute), the respondent relied on the *Merck* case, *supra,* allegations that the scope and subject of the subpoena were too broad, and

the argument that compliance would be unduly burdensome.

As previously stated, the authority of the Comptroller General to examine directly pertinent contract records in the *Merck* case, supra, was far more limited than the authority of the IG of the DOD: allowing him to subpoena any records necessary for his oversight responsibilities with regard to "all matter" relating to economy and efficiency in the DOD. In the instant case, the IG is well within his broad statutory discretionary rights.

The IG assured the court that he would personally monitor any possible problems with confidentiality. In addition, the reproduction costs (not required by the subpoena) of the 920 audit reports in question will be approximately $55,000, not an unreasonable amount of money (to be paid by the government), which will ultimately save the government the much greater expense of duplicating the actual audits themselves. Inspection of the internal audit reports will not be unduly burdensome, and the IG will expectantly accommodate any logistical problems involved in the production of these records.

The government paid the respondent $554,000 in 1983 for its share of respondent's internal audit activities, as a proportion of the total auditing cost. This cost was paid by the government, although the DOD has not examined the actual reports and does not know what they actually purchased by that money—a *quid pro nihil.* Thus, as the IG stated, "... I had suspicion that there's something there that they don't want us to have." and "I want to see what the Government is getting for its money". (Document 18, page 144 and Sherick Affidavit, page 5).

While it may be that the IG should not have used the DCAA because the DCAA had reasons of its own for getting information about the internal audit reports, it was nevertheless a discretionary right which Congress had given him, lacking his own personnel with which to act. He acted, he said, with the DCAA auditors because they were familiar with the subject matter, they were close to the source of the records, and they had long experience in reporting back to him on problems that they have found. Under such circumstances, it is not for this court to forbid the IG from using DCAA employees and to direct him to use some other agency employees or hire special employees for that purpose.

Because the respondent has been brought into this action for enforcement of a civil writ, it must be understood that that does not presume any culpability on the part of the respondent. The respondent properly resorts to due process in this judicial proceeding to test its theories as to the correctness or the incorrectness of the IG's authority to issue the subpoena. Neither do I infer, in any way, any wrongdoing on the part of the respondent because it is presently before me or the public officials who are before me, when I state that the public has a irrefutable and absolute right to demand: that its money payments be returned to it in full money value of whatever kind for which it bargains; that its own officials and employees and those with whom it deals be honest and honorable; and, that its legislators provide determined and independent processes and functionaries to eliminate or at least to substantially lessen the infiltration of fraud and waste in its publicly budgeted spending.

Thus, when the Congress endows administrative agents and agencies with means and methods for improving the public welfare and provides resort for enforcement by court procedure, it becomes incumbent upon the judiciary to enforce the specific process in aid of the public's right to a remedy in accordance with law as it pertains to the facts.

To do otherwise, would reinstate the public dilemna as it was as of the time when the Senators, concerned as they were, complained at the Hearing, Part 2, before the Committee on Governmental Affairs, on March 25, 1982, that if an IG for the DOD were created without strength and inde-

pendence, it would be only for a "cosmetic" purpose. The Senators made it perfectly plain at the hearing and in the amending Act of 1982 that they intended and wanted an independent IG who would have power and purpose to prevent and detect fraud, abuse and waste in the government programs.

In view of the attitude of the Senators as translated into clear, determined words by Congress in the 1982 Amendment, and lacking any illegality or impropriety on the part of the IG in issuing the subpoena, and being abundantly obvious from the evidence as a whole of the circumstances which required the issuance of a subpoena within the discretion of the IG, it is not for this court to substitute its judgment for that of the IG.

The IG might have delegated personnel other than those of the DCAA, but as the evidence indicates because of his lack of personnel and because the auditors of the DCAA are highly expert in their field and have special knowledge which no other personnel in any of the other agencies in the DOD possess, and with the assurance of the IG that the matter will be treated with professional confidence, and that only such matters will be reported as the law requires, I find that it is as much as the respondent may hope for.

We must remember that it is the auditing of the internal operations for which government money was spent and with which government resources, equipment and personnel have and are likely being used. Accordingly, the objections of the respondent will be denied, and the Petition for Enforcement of Administrative Subpoena by the Government will be enforced.

The Findings of Fact and Conclusions of Law are incorporated in this opinion in accordance with Federal Rule of Civil Procedure 52.[10]

10. Rule 52. Findings by the Court. "(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon ... If an opinion or memorandum of decision is filed it will be sufficient if the findings of fact and conclusions of law appear therein.